1613.42 Abbas v. United States Mr. Abbas. Thank you very much. Your Honors, thank you for inviting me to present the oral arguments. I appreciate it. I would like to start please with some history of these German bonds, if it's okay. The bonds were initially issued in the 1930s, after the First World War, after the Treaty of Versailles, to help Germany repay her reparations. There's an example, I believe, in the record, at least, of one of your bonds at A156. Yes. Government International, 5.5% bond issued in 1930. Are all of your bonds the same, or do you have different bonds? Well, the majority are, there's different bonds. There were like 82 different kinds of bonds that were issued. I'm talking about what in this case. In this case, this principally is this one, the Young bond. It's called the Young bond because it was devised by Senator Owen Young, who devised the plan for these German international bonds. And they established, as a trustee, also the Bank of International I'm just talking about, for purposes of our ability to write an opinion, can we describe your bonds as the German government international bonds? Yes. That's it. Yes. Yes. And there was nothing in the record about when it was precisely that you obtained the bonds. It was, you've said in your brief, it was in connection with the litigation, or as in the course of the litigation in the Seventh Circuit. And before that, in the Northern District. In the Northern District. In the District Court. In the District Court, and then it went to the South. One of my clients, I received the bonds from one of my clients. The date is potentially important, depending on how that date relates to October 3, 2010. Right. So I received the bonds before October 3, 2010. I received them in, I believe it was 2008 when I first started the case in the District Court in Illinois. 2008, okay. Thank you. Okay, continue. Okay, so essentially, you know, these bonds, or the bonds were sold in the U.S. by J.P. Morgan in Manhattan, New York. And they were approved by the U.S. Senator Stimson at the time, Secretary of State, approved this. But your problem is the statute of limitations, right? When did the claim accrue? And didn't it accrue when the United States adopted the validation treaty? Well, in terms of the accrual, I don't believe that the date of accrual is when the treaty was signed. I believe that we have to look at the provisions of the treaty, which is what this Court said in the case of Hare versus U.S. when they were addressing the treaty with Japan, that the provisions of the treaty have to be examined to determine exactly when the accrual of the claim. Because the date of the signing of the treaty is one issue, but the accrual for purposes of bringing suit is another issue. But the treaty, didn't the treaty provide that they could only be redeemed in the United States if they were validated by the administrative board? I mean, that's the event that caused your claim to accrue. Not exactly, not exactly. That was the starting point of the problem with this validation treaty. And I'm referring to the certain matters agreement because there were three treaties. One treaty was the multinational treaty, which was the London Debt Accord signed between 21 nations where Germany accepted liability for her debts and said, okay, we want to resolve our pecuniary obligations. So you're not suing in a German court? No, exactly. In a claimed court. Exactly. So the second treaty established the validation board in the US, said to the American bondholders, if you want to get paid, okay, you can go to JP Morgan in Manhattan, New York. But before you do that, you go to the validation board, which is across the street from JP Morgan, and you validate your bonds. Subsequently, the treaty was breached. And that's why we claim it's invalid, because Germany and the US shut down that validation board. So there was no American bondholders to validate in the US anymore. And they were forced to... And when was the board dissolved? 1960. 1960. So the treaty, I think, you know, it's important to distinguish the two kinds of treaties in the US. And I'm assuming now we're discussing that if this treaty is deemed self-executing, because in the Seventh Circuit, the treaty was held as non-self-executing. And I what type of treaty we're dealing with. But if the treaty is deemed self-executing, that means automatically enforceable law in the US. I believe it works at takings because it deprives individuals, bondholders of their legal rights and their right to sue for compensation for their bonds. And it's happened in the other courts that I've been in, that you present your claim, you're suing Germany, and the court says, no, you have this treaty, you cannot sue Germany. What would have prevented you from going into court earlier? Excuse me? The fact that you weren't validated? The fact that... In which court, Your Honor? Well, what would have prevented you from timely going for validation while the validation facility was open across the street from J.P. Morgan? No, well, I was not born at the time. I was born in 67. Well, that's part of your problem. At the time of what would be taking, you didn't have ownership. Yes, well, in terms of the bonds, these are bearer bonds. So under the law, and I have the cases from the Supreme Court, negotiable instruments, the transfer of ownership transfers title automatically, because these are bearer bonds. So I'm standing in the shoes of the original bondholder. Well, that may be a fact, but not for purposes of standing under our case law. Like, for example, the CRV Enterprises is the lead case, and it was relied upon by the Court of Federal Claims, and it's relied upon by the government, but you didn't file a reply brief. So I have no way of knowing what your reaction is to that, to the precedent that actually turned this decision on standing, both below and in the government's argument here. Well, that, Your Honor, CRV stands for the proposition that if you don't own, for example, if it's a question of flooding property, the government floods somebody's property. If you didn't own the property when it got flooded, and your cause of action accrued as a result of the flooding, then you bought the property later. You can't come in and complain as a matter of standing. Okay, well, my answer to that, and I understand your question, Your Honor, is that, you know, negotiable instruments are different from real property, because these are transferable. The title transfers by possession. When you possess the bonds, you have the right to make a claim. In the Supreme Court case of Shaw, I have the case here, it says that the right to sue, the right to sue of the bearer, the bearer of the bond, whoever's holding the bond, has the right to sue. And that's the essence of negotiating. Well, that was the point I was making, was that the people, whoever owned these bonds at the time that there was a validation procedure that was available could have gone to the validation procedure and got them validated. And if they had them validated, they could go to the United States District Court and sue the issuer of the bond saying, pay me. And what CRV says is that, regardless, when you are later on buying the asset that was involved, you didn't have standing to complain about what happened earlier. Okay, well, the actually— Would you argue a bearer bond is different from a bond that's registered? No, you wouldn't argue that. Yes, a bearer bond is freely transferred. It's not like a registered bond. A bearer bond is any person who's holding that bond has the right to sue. And the reason why the bondholders could not sue earlier— If they have standing. Yes, yes, of course. Of course, if you're the holder of the bearer bond, automatically you have standing because it's— I don't— If you're the holder of a bearer bond, that means you have the right. You have two kinds of rights. One is to receive the principal from the issuer. And the second, you have the right to receive the interest. I understand that, but what I don't— Because there was no reply brief filed here, I have trouble understanding your reaction to what I view to be the solid precedent I think the government's going to argue CRV on the standing point. Well, I think the Supreme Court case supersedes CRV. I think the Supreme Court says, which says negotiability gives you the right to sue, means you have standing. It says on a negotiable instrument like a bearer bond— Mr. Shaw, you say? Yeah, I will give you the— There's two cases from the Supreme Court on negotiability and negotiable instruments. And they discuss standing. But even if you're right on standing, you sued too late. Well, no, the question— And that goes back to accrual, when your claim accrued. Well, the reason why we waited to sue is because the treaty prohibited the non-validated bondholders from suing until all the validated bondholders' claims were paid off. This is what the treaty did. Precluded the right to sue in Germany? Anywhere. Precluded your compensation claim. What the treaty said— It precluded payment. It didn't preclude going to court. Lots of people went to court on these bonds. You know, we have four or five cases of people who went into court on these bonds before October 3, 2010. Now, the access to the court wasn't being barred. The ability to get paid. So if you had gotten validation, because it's clear that you can't get in a U.S. court without validation, that's what the treaty said. So if you'd gotten your validation, you could have gone to a U.S. district court, and you're not in one of the settling parties. You're a non-settling validated holder. You go and you sue the issuer, and you say, you owe me the money. And you get a judgment. You get like a default judgment, almost, because the issuer has no defense. Bonds are payable, and you have a judgment, which you have to wait a while to enforce. That's all. Yes, but the problem is, you cannot- It doesn't affect your ability to perfect your interest by getting the judgment. Well, you know, the way I'm reading this court's precedent in Ladd versus U.S. and the Supreme Court precedent in Bay Area Laundry case, that the cause of action accrues when you have a complete and present cause of action. Present, so it's the situation now. So you could sue before. Correct, I have a non-validated bond. I can sue, but I have no right to obtain relief. So there's two points in the accrual case that says the cause of action accrues when you can sue and you have the right to obtain relief. The problem with this treaty, what it did, was that it prevented or prohibited or precluded the non-validated bondholders from obtaining any relief. So to prevail, are you saying that we would have to find, we would have to invalidate the treaty as an inappropriate action, government action, or treat it as a taking? Yes, I say that if the treaty is considered as self-executing, which means automatically law in the U.S. I mean, because what this treaty did was bring in a German law by incorporation. Yes. Because now we're dealing, actually, this validation law is actually a German law. It's not a U.S. law. The U.S. permitted the validation board in New York to operate under German law for a certain period of time. And then it closed it down. So the bondholders here, have the non-validated bondholders, such as the bonds I have, have no more recourse in the U.S. So the treaty is breached. I think it should be invalidated. So we would then have to hold that there's no limitations, period, in terms of challenging the treaty despite its self-termination. Exactly. But you could only have a taking based on a lawful action. You can't have a taking based on an unlawful action. Yes, well... You're saying the treaty was invalid. Then that doesn't lead to a taking. Well, I'm saying that the treaty, in my opinion, is this bilateral treaty between the U.S. and Germany. I believe it's unconstitutional because it clearly, if it's deemed enforceable law in the U.S., it's automatic. It takes away or deprives the bondholder of their right to sue Germany. The Federal Circuit has said that in the case of alliance versus descendants of Texas, that a legal claim is a property interest that is subject to a taking claim. Now, the other way to say, the other way, if you don't want to invalidate the treaty, is to simply declare that it's non-self-executing in the sense that there was no implementing legislation by Congress to implement this treaty, that it was promises between two nations. So, okay, they made these promises, and then they breached their promises. And therefore, if it's not enforceable as automatically federal law in the U.S., then the bondholders can proceed with their claims against Germany. This is one way to deal with it. Let's hear from the government. We'll save you a rebuttal time. All right, thank you. Mr. Canizares. Good morning, and may it please the Court. Mr. Abbas's claim accrued, if at all, more than six decades ago when the trial court reached the right result in dismissing it as being barred by the statute of limitations, but also for lack of standing and for failure to state a claim. With respect to the statute of limitations issue, the only action on the part of the United States that Mr. Abbas is pointing to that could plausibly constitute a taking would be the entering into of the treaty in 1953, when the United States and Germany entered into this bilateral treaty, the purpose of which was to bring about some certainty with respect to these German bonds. And he is pointing to the treaty itself. He does so in his brief, as well as his complaint, pages 5, 7, 9, and 18 of his brief. He notes that it is the treaty itself and the terms and the effects thereof that have taken the property. And I think Mr. Abbas's argument here today is consistent with that notion, in that he takes issue with the terms of the treaty. Well, and he also presents something, I don't want to put words in his mouth, but some sort of holder in due course of these bonds shouldn't be bound by what was agreed to 60 years ago. Well, Your Honor, that argument is misplaced for the reason that the bondholders and the other circuits that have addressed these claims brought by these unvalidated bondholders have rejected the argument that he's making here today, the notion that holders of these bonds that have failed to validate them in a timely way were not precluded from bringing some claim against Germany at an earlier date. In the World Holdings case in particular, the 11th Circuit rejected the argument that the so-called non-assenting bondholders, those are the ones who would not want to go through this validation process, rejected the notion that they were somehow, couldn't bring their lawsuit before 2010. And in particular here, as the trial court properly recognized, he is conflating a cause of action against Germany with a cause of action against the United States. They're two obviously very separate things. To the extent that he's alleging a taking, and at this point, I know that there's some inconsistency. If he's alleging a taking, he cannot simultaneously argue that the United States is in breach of the treaty. But to the extent that he's alleging that a taking occurred, that cause of action would have accrued, if at all, in 1953, which is, as he's acknowledged, long before he took possession of the bonds. His citation to the, here, his discussion of the CRV Enterprises case is relevant for purposes of standing. The CRV Enterprises case does recognize the proposition, as Judge Clementer noted, that to state a claim for taking, or to recover on a taking theory, you need to be the owner of the property at the time that the taking occurred. And the problem that Mr. Abbas has is that he was not the owner at the time that the treaty was entered into. And he was not, nor was he standing in the shoes. And the Shaw case that he cites to does not overcome his burden of demonstrating standing. There is no proposition that I'm aware of that would allow someone holding a bond to recover on the basis of some alleged violation that occurred many decades before he took possession of it. So, as the trial court recognized, the fact that he did not own the bonds in 1953 is a separate basis for his not being able to show standing. Because he had no... If you were correct, that the statute was told to October, is it October 3rd? Is that the date? October 3rd, 2010. If you were correct in that argument, he says that he obtained his bonds before that date. Yes, Your Honor. And he has... According to Mr. Abbas, he came into possession of these bonds sometime prior to October 3rd, 2010. The October 3rd, 2010... Can we accept that for purposes of deciding this case? Because it wasn't... The date on which he bought those, picked those bonds, was not clear in the record below. In fact, the opinion of the Court of Fair Claims said as much. Well, Your Honor, my understanding from the trial court's decision is that the October 3rd, 2010... I'm sorry, the date on which he took possession of the bonds, it was some uncertainty on the record. The government does not have information to dispute his assertion that he acquired it sometime before 2010. But certainly the facts before the trial court would be reviewable for clear error and we don't have a reason to take issue with those facts. But the October 3rd, 2010 date is irrelevant for purposes of the statute of limitations for the reasons I just went through. But the court in the Korber case in the Seventh Circuit, in which Mr. Abbas was counseled, did address the timeliness problem and noted that these claims brought by these unvalidated bondholders could have been brought decades ago and that there were... This is in the Seventh Circuit's language. It was an attempt to circumvent the requirements under the treaty. So I respectfully disagree with this characterization that the treaty itself precluded him somehow from bringing this claim earlier. With respect to the other basis that the court reached, which was failure to state a claim, because Mr. Abbas did not own the bonds at the time that the alleged taking occurred, he is unable... He does not have a cognizable property interest that could allow him to prevail. And... And you disagree with his notion that, as Judge Newman was suggesting, like a holder of due course, the person he's holding a bearer of bonds somehow distinguishes CRV. Yes, Your Honor. I do... We do disagree with that proposition. I don't think that the notion that he has... These are bearer bonds that do typically give ownership rights to the person who possesses them. But the mere fact that that is the nature of the property right that he is pledging does not circumvent the standing requirement. If it were otherwise, there would be no statute of limitations. And... But for the treaty, there might be a quite different situation. Don't you think these bonds finally surfaced after all these years? Well, Your Honor, that does get to the treaty itself in that the treaty did establish mechanisms for this validation process that were... The treaty parties contemplated a short-term process for the validation procedures to unfold. And it phased out this validation for the United States in 1960. But... But these... All of these bonds were issued between World War I and World War II. So there's no question that the validation board was set up to resolve those already existing bonds. And presumably, those are the bonds that Mr. Abbas has as well. But in terms of the failure to state a claim, I do want to... 1960 actually is a six-year... Potentially respecting the six-year statute of limitations in the Court of Federal Claims. Well, it may be off by one year, Your Honor. But it's more... It's plus a year. Right. It would be plus a year, the 1960 date. But what the treaty said was it actually gave... I believe it was until 1958 that bondholders had to come forward and validate their bonds. But the notion that he's arguing today, I do want to emphasize, is the notion that the court should examine the justification... This particular requirement is problematic for a number of reasons. Number one, as the court recognized in the Belk and the Abraham-Urey cases, in a takings context, the United States, when it enters into these sort of settlement agreements that are, by their definition, a sort of political judgment, they are not susceptible to judicial review. In the Belk case, the political question doctrine was implicated involving the settlement of claims against the government of Iran. And also, as far as takings are concerned, he cannot show that he had any sort of legitimate investment-backed expectations that were deprived,  But that ground wasn't passed on below. That's correct, Your Honor. Your merits argument on the takings claim is asking a lot of us because we don't find facts. Yes, Your Honor. I would agree with that. And the government's position is very clearly that... Background coloration, isn't it? That's fair, Your Honor. Our position is that the court should affirm, the most immediate problem being the statute of limitations. All we have in front of us now are the statute of limitations and the standing issues. Right. Well, certainly the court would be within its purview to affirm on these alternative grounds. And the government's position is, should it reach the merits of the takings issue, which he has raised in his brief as an alternative basis, we would respectfully ask the court to affirm on that basis as well. But Your Honor is correct. In terms of the self-executing treaties, and Mr. Abbas has referred to this doctrine, and it is somewhat of a complex doctrine, but his argument seems to be that if the treaty... He seems to be trying to support an argument that he wants the court to find that the United States has somehow breached the treaty. And again, that's problematic, not only because it's inconsistent with the notion of bringing a takings claim, but it does ask the court to inquire into the very essence of the treaty itself, which was, again, a sort of a political judgment that this would be a way to resolve these claims with Germany in terms of a bilateral treaty. And the court of federal claims does not have jurisdiction, as we pointed out in our brief, to examine claims that are emanating from a treaty. So that would be another obstacle to the argument that he seeks to make. But in any event, the self-executing treaty doctrine is not really relevant to the court's resolution of this dispute. For those reasons, we respectfully request that the court affirm the judgment below. Thank you. Okay. Thank you, Mr. Canisar. So, Mr. Abbas, that's a rebuttal time. Yes. Well, I respectfully disagree with his contentions. Dames and Moore, which was one of the cases that dealt with the president's power to settle claims. First of all, this treaty didn't settle anything, didn't resolve anything. It created a mechanism for certain bondholders who wanted to validate and get lower payments to go through the German system. The others who wanted full payment had to wait in line and their claims were suspended for decades, for 60 years. I have a client who's over 80 years old. She's almost 90 and she's been waiting all her life to get her bonds redeemed. All she wants to do is go to J.P. Morgan, present her bonds. And these treaties are blocking her from suing J.P. Morgan and from suing Germany. They've taken away her rights. She's presented bonds in Germany. They told her, we're not going to validate. Thank you very much. That's it. So, this treaty wants to send people to Germany and Germany doesn't want to validate bonds. So, it deprives their claims. So, Dames and Moons says that the suspension of claims, you have the right to go to the Court of Federal Claims to assert your takings claim. This is what Dames and Moons says. I mean, I appreciate the difference between your client who was an original purchaser of the bonds 80 years ago and you. Yes, well, I received some of the bonds from my client. You know, so I, what I'm saying is the holder in due course. We understood that. Yeah. So, the other point is. I thought you were reacting to the government's argument on the merits about investment-backed expectations and that sort of thing. Yeah, well. Your client who actually bought the bonds 80 years ago had different expectations than you did. No, but the bearer of the bond has vested rights. And in the sinking fund cases. I understand. You know, these vested rights are irrevocable. And the Dames and Moon case, the president held that the claims could be transferred to Den Haag because those were contingent rights that the president could take away. But with bearer bonds and with these irrevocable vested rights, we're saying that this treaty has deprived the bondholders of their rights by incorporating a German law into the U.S. Which, Article 52, he claims that we were not prohibited. We were. The treaty 4 U.S.T. 797, which is the second validation treaty, which established the validation work and incorporated Article 52 of the German law, says you cannot sue for compensation until all the other bondholders are paid. So, the non-assenting bondholders who wanted full payment, and they had the right. Not all people wanted quick payment and settlement and pennies on the dollar. Some people wanted their full rights. So, they had to wait until 2010. And I'm saying that the accrual of the takings claim runs parallel with the accrual of the claim against Germany because you cannot make a takings claim unless you have a valid legal claim that has been interfered with, or that has been taken. So, the bondholders did not have cognizable legal claims against Germany until October 2010. And that's when their right to sue Germany and to obtain relief, not only to sue. I can sue in a million courts. I can sue every day in a different court based on these bonds. But I will not obtain relief until after 2010. So, that's why the rightness of the accrual date. Okay, the treaty was signed in 1953, but it doesn't mean that a person doesn't have rights when the treaty prohibit that person from presenting their claims until 2010 or obtaining relief until after 2010. Okay, no more questions. Okay, thank you. Thank you, Mr. Abbas. Thank you. The case is taken under submission.